77 F.3d 707
 Charles PARKHURST, Appellant,
v.
Officer Edward TRAPP, Kilbuck Township Police Dept.;
Officer Craig Cannella, Kilbuck Township Police
Dept.; Chief Jack Lennon, Kilbuck
Township Police Dept., Appellees.
 No. 95-3232.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 7, 1995.
Decided Feb. 23, 1996.
 
 Appeal from the United States District Court for the Western District of Pennsylvania (D.C. Civil No. 93-399).
 Mark A. Eck, Paul A. Robinson (argued), Meyer, Darragh, Buckler, Bebeneck & Eck, Pittsburgh, PA, for Appellees.
 Michael L. Rosenfield (argued), Pittsburgh, PA, for Appellant.
 Before: STAPLETON, SAROKIN and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This appeal primarily raises an interesting question concerning the temporal extent of the exigent circumstances exception to the Fourth Amendment permitting a warrantless search of a person's home. Although the Fourth Amendment to the federal constitution has in recent years suffered considerable battering, the amendment still remains intact as a historic bulwark protecting a person's home from unreasonable search for the discovery of papers and records that might be used to convict the owner of crime.
 
 
 2
 The seeds for that amendment were planted in England in the 18th century when agents of the Crown executed a general warrant, naming no particular person or place, and searched the house of John Wilkes, a printer and publisher of a publication known as the North Briton. The North Briton, especially issue no. 45, denounced the incumbent government. In an effort to obtain evidence that Wilkes was the printer and publisher, the King's agents acting under a general warrant entered Wilkes' house and indiscriminately seized his papers. Wilkes sued the perpetrators for entering his dwelling, searching for, examining and seizing his papers.
 
 
 3
 The Fourth Amendment to the United States Constitution is in part a response to the outcry and reverberations generated by the Wilkes episode. In succinct but stentorian terms, the Fourth Amendment provides that no searches and seizures of personal property may occur without a warrant lawfully issued which particularly describes the place to be searched.[1] Courts especially have been vigilant in cases involving a citizen's papers, in which people usually have the greatest interest in privacy. See, Boyd v. United States, 116 U.S. 616, 629, 6 S.Ct. 524, 531-32, 29 L.Ed. 746 (1886). Despite the Fourth Amendment's long and historic tradition, police officers, caught up in the heat of the chase, sometimes disregard warrant requirements.
 
 
 4
 The case before us represents one of these instances. Without a warrant, and with no attempt to secure one, three police officers entered a citizen's home. In his absence, they spent several hours searching and rummaging through his private papers and effects, seizing numerous items. The citizen, Charles Parkhurst, in response filed this action in the United States District Court for the Western District of Pennsylvania, under 42 U.S.C. § 1983, seeking damages for the violation of his civil rights. Because we hold that no exigent circumstances excused these officers from complying with the Fourth Amendment's warrant requirement, we reverse the judgment of the district court entering summary judgment for the police officers. We remand with directions to enter summary judgment for the plaintiff on the defendants' liability, and to proceed with a trial as to the amount of damages, if any, suffered.
 
 I.
 
 5
 The undisputed facts are that plaintiff Charles Parkhurst is estranged from his wife, Melanie, and they have begun divorce proceedings. In the meantime, they have a state court-ordered joint custody arrangement of their three-year old son. On July 17, 1991, Melanie arrived at Charles Parkhurst's residence to pick up their son for her turn at custody. No one responded when she honked the horn. Melanie then went to the side door and knocked, at which point the plaintiff opened the door, told her in an obscene manner to leave, and slammed the door. She began to leave, when her husband fired a gun in her direction.
 
 
 6
 Melanie immediately reported the incident to the police, expressing concern for the safety of their son Dylan. She stated that she believed her husband and his mother Sally were hiding the child, and that she, Melanie, feared for the child's safety.
 
 
 7
 Based on this information, Edward Trapp and Craig Cannella, the two police officers listed as defendants, went to plaintiff's residence to question him at approximately 7:00 P.M. When they knocked, he answered the door. Officer Cannella then directed the plaintiff to put his hands on the wall. The plaintiff and the defendants disagree as to whether the officer drew his gun as he made this request. Plaintiff then slammed the door and ran upstairs. The officers broke down the door and followed him inside to his bedroom. Parkhurst admitted firing his gun at his wife, and told the officers that the gun he had used was in the nightstand. The officers removed the gun and also found in the nightstand three knives and several live rounds of ammunition. They asked plaintiff if he had any other weapons. When he directed them to the bedroom closet, they discovered four more guns and 1,048 rounds of ammunition.
 
 
 8
 The officers then performed a protective sweep of the entire house. They stated that their purpose in doing so was fear for their own safety, because they did not know if Sally and the child Dylan might be hiding in the house, and thought that Sally might be armed and dangerous. They did not find either the grandmother or the child but they did confiscate several other weapons. In addition, they found a note which indicated that Sally had taken Dylan away. The officers then arrested plaintiff and had him arraigned.
 
 
 9
 The following day, July 18, at 11 a.m., Melanie came to the police station to file a missing persons report on her son Dylan. The same officers, as well as Chief of Police Jack Lennon, took the information. The officers worked on the report until 1 p.m. At that point, without attempting to secure a search warrant, the officers returned to the plaintiff's residence. He was still incarcerated at this point, and the officers did not attempt to question him about the child's whereabouts.
 
 
 10
 Again, the officers searched the house. Their stated purpose for this search was to find anything that might help them find the child. They took over sixty items from the home, including address books, checkbooks, slips of paper containing names, addresses, or notes, credit card information, greeting cards, letters to Sally Parkhurst, prescription information, photographs of Sally and Dylan, several nude photos,[2] videotapes, and copies of the criminal record of Melanie's new boyfriend. The police then questioned Charles Parkhurst, and through the information he had given, and one of the addresses they had found in the search, traced Dylan and his grandmother to California.
 
 
 11
 Charles Parkhurst pled guilty to aggravated assault and concealing the whereabouts of a child. He then filed a pro se Section 1983 action against the police department and the individual officers involved in the search of his premises for civil rights violations based on both searches of his home. The court granted summary judgment in favor of the police department, as the departmental entity could not be sued under Section 1983. The court also entered summary judgment against plaintiff on his Fifth, Eighth, Ninth and Fourteenth Amendment claims,[3] leaving only plaintiff's Fourth Amendment claims. The court determined that the exigent circumstances of July 17 permitted the officers to make their initial search of the house on that day. However, it denied summary judgment to the police officers on the July 18 search, because it was not convinced that the circumstances were exigent. Plaintiff does not appeal any of these rulings.
 
 
 12
 The police officers then submitted affidavits stating that two hours had passed between Melanie's July 18 report and their search, that those full two hours had been spent in preparation of the report, that it would have taken another two hours to apply for a search warrant, and that because of the youth of the child they did not want to wait. Both sides filed motions for summary judgment. Upon receiving this information, the district court granted summary judgment for defendants with respect to the July 18 search, holding that there had been no actionable Fourth Amendment violation. Consequently, the court denied plaintiff's motion. Plaintiff appeals these rulings granting defendants' motion and denying his own.
 
 II.
 
 13
 Although warrantless arrests in public places are valid, entry into a dwelling, even for purposes of an arrest for a serious crime, stands on an altogether different footing. "[A] greater burden is placed ... on officials who enter a home or dwelling without consent. Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." Payton v. New York, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1979), quoting Dorman v. United States, 435 F.2d 385, 389 (D.C.Cir.1970).
 
 
 14
 To search a person's home and belongings, police officers ordinarily must first seek a warrant based on probable cause supported by oath or affirmation. Warrantless searches are presumptively unreasonable under the Fourth Amendment. Payton, 445 U.S. at 586, 100 S.Ct. at 1380; United States v. Acosta, 965 F.2d 1248, 1251 (3d Cir.1992). Police must have probable cause to search, or the search is per se illegal. However, certain circumstances can excuse the warrant requirement. Among these are an inventory search incident to a lawful arrest (Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987)), objects in plain view of the officers (Arizona v. Hicks, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987)) and exigent circumstances (Welsh v. Wisconsin, 466 U.S. 740, 749, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984)), the last of which is claimed here. To excuse the absence of a warrant, the burden rests on the State to show the existence of these exceptional situations. Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970).
 
 
 15
 In the present case, plaintiff concedes that police had probable cause to make both searches. It is uncontroverted, however, that police did not have a warrant, nor did they attempt to secure one before searching the premises. Defendants assert that they did not need a warrant because of the exigency of the circumstances.[4] According to their time-line, they took a missing-child report from Melanie from 11 a.m. until 1:30 p.m. on July 18. At 1:30 p.m., they then went to search Charles Parkhurst's house for the child or evidence of his whereabouts.[5] The officers claim that obtaining a search warrant would have taken until at least 3:30 p.m., and that was too long to wait when a child's safety was at stake.
 
 
 16
 I felt because we had a missing child, we didn't know where the child was, we didn't know if the child's body was there, we didn't know if the child's grandmother's body was there, we knew absolutely nothing at that time, I felt, at the time, time was of the essence and we needed to be there and gather anything that we could find to find where this child was.
 
 
 17
 Lennon Deposition. Concern for safety of others usually is a valid type of exigent circumstances.
 
 
 18
 However, to qualify as exigent, the officers reasonably must believe that someone is in imminent danger. Nothing in the present case shows this imminence. There are no facts to demonstrate that the plaintiff might have harmed his son. In addition, Charles Parkhurst was in jail, and the guns in the home had been confiscated.
 
 
 19
 In Good v. Dauphin County Social Services, 891 F.2d 1087 (3d Cir.1989), this court concluded that no exigent circumstances existed to justify officials' warrantless entry into a home, and subsequent strip search of a seven-year-old girl, when the officers had a report that the child had been the victim of abuse, but there was no evidence that she was in imminent physical danger. Therefore, the court reversed the grant of summary judgment in favor of the defendants in Good's Section 1983 action. The court noted:
 
 
 20
 [There is little] rational basis for a state actor to conclude that forced entry in the residence was required to protect Jochebed [the seven-year-old] from imminent harm. This is evident, among other things, from the fact that, at the time of the entry, the responsible authorities had possessed the anonymous tip for at least twenty hours.
 
 
 21
 Good, 891 F.2d at 1095. Similarly, the officers here knew at 7 P.M. the previous evening that the child was missing, and had seen the note from his grandmother, Sally, stating that she had taken the child away. The officers had performed a protective sweep of the residence for Sally incident to Charles Parkhurst's arrest, and had determined that she was not in residence. Parkhurst was then placed in jail, and had not had access to the residence since that evening. Nothing he said or did indicated he would have, or had, harmed Dylan. Consequently, at the end of their first search, the officers had no basis for believing that Dylan was in imminent danger.
 
 
 22
 The officers were not at liberty to decide that Dylan's absence created exigent circumstances for a second warrantless search, eighteen hours after the officers had this information. In the intervening hours, the only occurrence was Melanie's filing of a missing persons report. There is nothing to show that the report provided any new information which would have created a fear that Dylan was in more danger than he had been in at 7 P.M. the previous evening. To enter the residence without a warrant at the time of the second search, the officers had to have a rational basis for believing exigent circumstances existed. At no time between the first and second search did such circumstances come into existence. We hold that such exigent circumstances as may have existed the day before did not justify the failure to obtain a warrant for the officers' second search of the Parkhurst dwelling on the next day.
 
 III.
 
 23
 The defendants attempt to avoid the imposition of summary judgment by arguing that, even if their conduct violated the Fourth Amendment, qualified immunity should shield them from liability. Qualified immunity is available to state actors in Section 1983 suits if those actors reasonably believed that their conduct was lawful. Shea v. Smith, 966 F.2d 127 (3d Cir.1992). Qualified immunity is an applicable defense to actions based on Fourth Amendment violations. Anderson v. Creighton, 483 U.S. 635, 643, 107 S.Ct. 3034, 3041, 97 L.Ed.2d 523 (1987).
 
 
 24
 However, a good faith belief in the legality of conduct is not sufficient. Such belief must be objectively reasonable. To determine reasonableness, a reviewing court must ask "whether a reasonable person could have believed the defendant's actions to be lawful in light of clearly established law and the information he possessed." Anderson, 483 U.S. at 641, 107 S.Ct. at 3040. The objective facts control a decision on summary judgment, regardless of allegations of intent. Id.
 
 
 25
 The magistrate judge, whose recommendation the district court adopted, held that qualified immunity was applicable to the conduct here. The magistrate judge held that the search was not per se improper. This ruling is erroneous. This court in Good, supra, specifically held that officers must have a rational basis for believing exigent circumstances exist, and noted that the probability of such a basis existing is diminished when officers know all of the relevant information many hours before they act on it. In this case, the police knew that Dylan was missing and likely to be with his grandmother after they conducted the protective sweep of the house on July 17. The second search, 18 hours later, was based on no new information. In light of the previous search by the officers just 18 hours before, that Charles Parkhurst could not have come to the residence in the intervening time because of his confinement, that no attempt had been made to secure the residence, and that officers acting reasonably should have been aware of the clearly established law of Good, the magistrate judge erred in holding that the individual defendants enjoyed qualified immunity.
 
 
 26
 We hold that the second search of the Parkhurst residence violated the Fourth Amendment and the police officers reasonably should have known that their conduct was unlawful. Therefore, the district court erred in entering summary judgment for the defendants on the issue of the police officers' liability. This holding makes it unnecessary for us to reach the issue of whether the scope of the search was proper.
 
 IV.
 
 27
 Accordingly, the judgment of the district court will be reversed. The case will be remanded to the district court with directions to enter summary judgment for the plaintiff on the issue of liability, and to proceed with trial to determine the amount of damages, if any, the plaintiff may have suffered.
 
 
 28
 Costs taxed against the appellees.
 
 
 
 [1]
 The amendment provides: "The right of the people to be secure in their persons, homes, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."
 
 
 [2]
 The police characterize these photos as "obscene." Charles Parkhurst is apparently a photographer, and had taken and developed these photographs himself. The police claim that they confiscated the photos because one of the photos was of Dylan exposing his buttocks to the camera. They were concerned that this was child pornography, or that Charles Parkhurst had involved Dylan in something "satanic." Charles Parkhurst asserts that he had taken the photograph of Dylan's buttocks to document bruises and welts on the child. He believed that Melanie Parkhurst and her boyfriend were physically hurting Dylan
 
 
 [3]
 The claims, written by the plaintiff pro se, all related to the alleged search and seizure
 
 
 [4]
 Defendants also note that the search eventually did lead to locating Dylan and Sally Parkhurst. One of the scraps of paper recovered contained a name and address, as well as a flight number, where the two were. This does not affect the determination of probable cause and exigent circumstances. An unlawful search never can be justified by its fruits. Many years ago, even without the benefit of the Fourth and Fifth Amendments of the Bill of Rights, an English court denounced the entry into a man's home to obtain evidence with these words: "To enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish Inquisition; a law under which no Englishman would wish to live an hour; it was a most daring public attack made upon the liberty of the subject." Huckle v. Money, 95 Eng.Rep. 768, 769 (1763)
 
 
 [5]
 Exigent circumstances also may exist when delay threatens the destruction of evidence. See Schmerber v. California, 384 U.S. 757, 770, 86 S.Ct. 1826, 1835-36, 16 L.Ed.2d 908 (1966). Here, the officers have not alleged a single reason why evidence concerning Dylan's whereabouts would have been destroyed had they taken the time to secure a search warrant. Their need for evidence does not even remotely create anything hinting of exigent circumstances