

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-23-1997

# Kornegay v. Cottingham

Precedential or Non-Precedential:

Docket 96-7423

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Kornegay v. Cottingham" (1997). *1997 Decisions*. Paper 167.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/167

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled July 23, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-7423

LYNETTE KORNEGAY, on her behalf and as guardian ad
litem for her two minor children; ANDREA ALEXANDER;
REGINALD KORNEGAY,

Appellants

v.

DEWAYNE COTTINGHAM, Detective, and certain
unidentified officers of the Wilmington Police Force;
ALFRED KACZAROWSKI; JOHN CIRATELLA; SCOTT
SOWDEN; LIAM SULLIVAN; WILLIAM BROWNE; BRUCE
COFFIEY; M. J. BROWNE; SEAN FINERTY; RICHARD
IARDELLA; MARLYN DIETZ; OFFICER THOMAS SPELL;
JACK FORTNEY; MICHAEL RODRIQUEZ; RICHARD
BROWN; CITY OF WILMINGTON

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
Civil Action No. 95-cv-00161

Argued: February 14, 1997

Before: COWEN, MCKEE, and JONES,* Circuit Judges.

(Filed July 23, 1997)

_____

*The Honorable Nathaniel R. Jones, Circuit Judge, United States Court
of Appeals for the Sixth Circuit, sitting by designation.

Charles Slanina, Esq.
 (Argued)
Biggs & Battaglia
1800 Mellon Bank Center
P.O. Box 1489
Wilmington, DE 19899

 Attorney for Appellants

William J. Rhodunda Jr., Esq.
 (Argued)
City of Wilmington Law Department
City/County Building, 8th Floor
800 N. French Street
Wilmington, DE 19801

 Attorney for Appellees

**OPINION OF THE COURT**

MCKEE, Circuit Judge.

Lynette Kornegay filed this action under 42 U.S.C. § 1983 alleging that various Delaware law enforcement officers conducted an illegal search of her home in violation of the Fourth and Fourteenth Amendments. The district court granted defendants' motion for summary judgment based upon their assertion of qualified immunity. For the reasons that follow, we will reverse in part and remand for further proceedings consistent with this opinion.1

_____

1. Kornegay raises four claims in this appeal: (1) the search warrant was facially defective in failing to state any facts from which the informant's reliability could be assessed; (2) detective Cottingham acted with reckless disregard for the truth in failing to disclose that his confidential informant was unreliable; (3) detective Cottingham acted unreasonably in believing that Shannon Selby could be found at 2611 N. Locust Street; and (4) the Crisis Management Tactical Team conducted an unlawful entry by failing to comply with the knock-and-announce requirement. We will affirm the decision of the district court on the first three claims without discussion.

2

I.

Kornegay and her minor children moved into a house located at 2611 N. Locust Street, Wilmington, Delaware in April 1994. The previous tenant, Dorothy Selby, had moved from that address in January 1994. Her nephew, Shannon Selby ("Selby"), occasionally listed his aunt's address as his own.

In April 1994, Selby became a suspect in the April 14, 1994 murder of Montel Morgan. Wilmington police detective DeWayne Cottingham headed that investigation and, after a preliminary investigation into Selby's whereabouts, incorrectly concluded that Selby was living at 2611 N. Locust Street. Acting upon that belief, Cottingham applied for and obtained a search warrant for that address. The warrant listed Selby and the murder weapon as the subjects of the search even though Selby was not considered the shooter. His alleged involvement in Morgan's murder was telling the actual shooter to shoot Morgan.

On May 5, 1994 at 6:00 a.m., members of the Crisis Management Tactical Team ("CMTT") executed the warrant which had been labeled "high risk" because Selby was wanted for Morgan's murder. The CMTT used a battering ram to break down the front door of 2611 N. Locust Street. Only after the door was broken in did the officers identify themselves by yelling "Police. Search Warrant." They entered each room with guns drawn yelling "Police. Search Warrant." In an upstairs bedroom, police found Kornegay, a male friend, Andre Alexander, and Kornegay's twenty-month old daughter in bed. The police ordered them not to move, and Alexander was dragged from the bed and handcuffed for a few minutes. Other officers brought Kornegay's seven-year old son from the adjacent room where he had been sleeping to his mother's room. He was harshly told to "get in to where they are."

At that point, an officer downstairs called out "all clear", and the CMTT left the house. Kornegay and Alexander were given clothes to change into from their pajamas and brought downstairs. Once downstairs, Kornegay was given a copy of the search warrant. Only then did she learn that the police were searching for a murder suspect named

3

"Shannon Selby." In all, the CMTT remained in the house approximately five minutes. During that time, the officers restricted their search to behind furniture and the inside of closets. Only the front door was damaged. Kornegay and her children, however, were understandably frightened and upset by the incident.

Kornegay subsequently filed a civil rights action under 42 U.S.C. § 1983 on behalf of herself and her children against the officers who executed the search. She alleged that the officers had violated the Fourth and Fourteenth Amendments by relying on a warrant that was facially defective and then searching their home in an unreasonable manner. The officers moved for summary judgment arguing that they were protected under the doctrine of qualified immunity. The district court agreed and granted summary judgment. This appeal followed.

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 which gives us jurisdiction over "appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291.2

II.

Kornegay contends that there are issues of material fact regarding the reasonableness of the officers' conduct in executing the search warrant and that the district court therefore erred in granting them summary judgment. Our standard of review is plenary.

Thus, `[we] review the district court's summary judgment determination de novo, applying the same standard as the district court. . . . [I]n all cases summary judgment should be granted if, after drawing

---

2. In their brief, the appellants cite the collateral order doctrine as the basis for our appellate jurisdiction. However, the authorities they cite for that proposition all involve cases in which summary disposition was denied the government actors. See, e.g., Forsyth v. Kleindienst, 729 F.2d 267, 271 (3d Cir. 1984); Evans v. Dillahunty, 711 F.2d 828, 829-30 (8th Cir. 1983). Here, the district court granted summary disposition to the officers. Thus, the appellants are appealing afinal order of that court, and, therefore, our jurisdiction derives from 28 U.S.C. § 1291.

4

all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law.

Spain v. Gallegos, 26 F.3d 439, 446 (3d Cir. 1994)(quoting Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1230 (3d Cir. 1993)).

III.

"Government officials performing discretionary functions generally are shielded from liability for civil damages if their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." Shea v. Smith, 966 F.2d 127, 130 (3d Cir. 1992).

"[I]t is inevitable that law enforcement officers will in some cases reasonably but mistakenly conclude that [their conduct was lawful]." Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995). Accordingly, we do not inquire into whether these defendants violated the Fourth and Fourteenth Amendments. Instead, we must determine if a reasonable fact finder could conclude that their conduct did not violate clearly established law of which a reasonable person would have known. Qualified immunity turns on the reasonableness of the officers' belief that their conduct was legal not its legality per se. "To determine reasonableness, a reviewing court must ask `whether a reasonable person could have believed the defendant's actions to be lawful in light of clearly established law and the information he possessed.' " Parkhurst v. Trapp, 77 F.3d 707, 712 (3d Cir. 1996)(citation omitted); see also Shea, 966 F.2d at 130 ("[A]n official who conducts an illegal search may not be held personally liable if he could have reasonably believed that the search comported with the Fourth Amendment."). " `Clearly established rights' are those with contours sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id. Since the instant challenge focuses in large part upon the officers' failure to knock and announce their presence, we

must determine the extent to which the "knock and announce" rule was a "clearly established" right when they searched Kornegay's home.

A. The "Knock and Announce" Rule

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Wilson v. Arkansas, 514 U.S. 927, 115 S. Ct. 1914, 1916 (1995). The "commonlaw requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry" is incorporated into the Fourth Amendment's guarantees. Richards v. Wisconsin, ___ U.S. ___, 117 S. Ct. 1416, 1418 (1997).3 This rule has come to be known as the "knock-and-announce" requirement and it "strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries." Id. at 1421-22.

First, it reduces the likelihood of injury to police officers, who might be mistaken, upon an unannounced intrusion into a home, for someone with no right to be there. Second, it seeks to prevent needless damage to private property. Finally, it embodies respect for the individual's right of privacy, which is to be imposed upon as little as possible in making an entry to search or arrest.

United States v. Nolan, 718 F.2d 589, 596 (3d Cir.1983)(citations omitted).

In United States v. Gable, 401 F.2d 765 (3d Cir. 1968), police obtained a warrant to search the defendant's house for gambling equipment. They attempted to gain entry to the house by inserting a crowbar into the door and prying

_____

3. Richards was decided after the search at issue here and thus the officers who searched Kornegay's home cannot be charged with knowledge of it. However, we cite it because the case affirms the necessity for a case-by-case inquiry into the reasonableness of the police conduct under the law at the time of the search.

6

it open without first knocking or announcing their presence or purpose. As they were forcing the door, the defendant voluntarily opened it. We held that the entry was illegal because police failed to announce their purpose before using the crowbar to pry the door open. That case was decided nearly thirty years before the search at issue here.

Even the highest court in the state where the instant search was executed had years ago declared a search unreasonable when police failed to comply with the knock-and-announce requirement. See Tatman v. Delaware, 320 A.2d 750 (Del. 1974). In Tatman, police obtained a search warrant which they executed at 6:00 a.m. They knocked on the street door to the multi-family dwelling, waited a few seconds, and then used sledge hammers to break the door down. Police then went to the second-floor apartment described in the warrant and broke into that apartment without knocking or announcing their purpose. The court declared "[t]he no-knock search here was unreasonable and violative of Fourth Amendment requirements. Prior to the entry of a residence, the police officer is required by the common law, in executing a warrant, to signify the cause of his coming, and to make a request to open the doors." Id. at 750 (citations and internal quotation marks omitted).

As noted earlier, Richards v. Wisconsin reaffirmed the common law rule. In Richards, the defendant was convicted of possession of cocaine with intent to distribute based upon evidence that was seized from his hotel room following a "no-knock" entry pursuant to a search warrant. The Wisconsin Supreme Court affirmed the trial court's denial of the defendant's suppression motion reasoning that, given the inherent danger of today's drug culture, "police officers are never required to knock and announce their presence when executing a search warrant in a felony drug investigation." Richards, 117 S. Ct. at 1418. The U.S. Supreme Court reversed holding that there could be no categorical exception to the rule. "Instead, in each case, it is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement." Id. at 1421.

7

A "no-knock" entry is justified when "the police [ ] have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime." Id.; see also Wilson, 115 S. Ct. at 1918-19; United States v. Singleton, 439 F.2d 381, 385-86 (3d Cir. 1971). Courts have upheld dispensing with the knock-and-announce requirement in four situations: (1) the individual inside was aware of the officers' identity and thus announcement would have been a useless gesture; (2) announcement might lead to the sought individual's escape; (3) announcement might place the officers in physical peril; and (4) announcement might lead to the destruction of evidence. See Richards, 117 S. Ct. at 1421; Wilson, 115 S. Ct. at 1919; Bodine v. Warwick, 72 F.3d 393, 397 (3d Cir. 1995); United States v. Stiver , 9 F.3d 298, 302 (3d Cir. 1993); United States v. Kane, 637 F.2d 974, 978 (3d Cir. 1981).

Here, the magistrate issued an ordinary warrant to search the residence at 2611 N. Locust Street. Such a warrant "authorize[s] an executing officer to enter the property where the search or seizure was to occur but would not confer `no knock' authority unless the warrant so indicated." Bodine, 72 F.3d at 396. Therefore, the officers are shielded by qualified immunity only if they "could reasonably have decided that an urgent need existed for such an entry into the premises." United States v. Stewart, 867 F.2d 581, 584 (10th Cir. 1989). "To determine reasonableness, a reviewing court must ask itself `whether a reasonable person could have believed the defendant's actions to be lawful in light of clearly established law and the information he possessed.' The objective facts control a decision on summary judgment, regardless of allegations of intent." Parkhurst v. Trapp, 77 F.3d 707, 712 (3d Cir. 1996)(citation omitted). With these principles as our guidepost, we examine the actions of the officers here.

B. The Officers' Information

Detective Cottingham was assigned to investigate the April 14, 1994 murder of Montel Morgan, who had been shot in the stomach in a high-crime area of Wilmington

called "the Bucket." Cottingham learned from one witness that Shannon Selby told another individual at the scene to shoot Morgan. A second witness confirmed that someone other than Selby had shot Morgan but stated only that Selby was present. This witness did not implicate Selby in the shooting at all. Based upon this information, Cottingham obtained an arrest warrant for Selby charging him with first-degree murder, first-degree conspiracy, second-degree conspiracy, and tampering with a witness.[4] All of the murder-related charges were based on Selby's alleged encouragement of the shooter. It is undisputed that Cottingham did not think that Selby had shot Morgan.

After obtaining the arrest warrant, detective Cottingham applied for a warrant to locate Selby. Although Cottingham initially found three different addresses for Selby among various police and court documents, a preliminary investigation suggested that Selby's correct address was 2611 N. Locust Street. Residents in the Bucket confirmed that Selby lived in the vicinity, but they did not know where. A review of police records disclosed three different addresses for Selby, one of which, 2611 N. Locust Street, was in that area. The most recent arrest report listing N. Locust Street as Selby's address was from January 1993. Further investigation disclosed that a new telephone number had been issued to a "Dorothy Selby" at that address. Cottingham made no further effort to determine if that number was still assigned to that address, but he did call the number and ask for "Shannon Selby." He was told that Selby was not there.

On May 4, 1994, detective Cottingham obtained a warrant to search 2611 N. Locust Street for Selby and the murder weapon. Cottingham decided to execute the warrant at 6:00 a.m. on the following day and requested that the Crisis Management Tactical Team ("CMTT") assist with the search. The warrant was labeled "high risk" because Selby was wanted in connection with a serious felony, and the weapon involved had not been recovered. The CMTT was instructed to consider Selby armed and dangerous.

---

4. The second witness reported to police that several individuals including Selby threatened her after the incident.

9

On May 5, 1994 at 6:00 a.m., the CMTT, wearing masks and bullet-proof vests, broke down the door at 2611 N. Locust Street. After the door was broken in, the officers yelled "Police. Search Warrant." The officers thereafter entered Kornegay's home and proceeded as set forth above in Part I.

The district court agreed with the Magistrate Judge's Report and Recommendation that these "circumstances justified deviation from the knock and announce rule, as the high risk warrant was for a first degree murder suspect who was a known drug dealer with previous arrests for felony offenses involving the use of a weapon, and the gun used in the murder had not been recovered." App. at 46. We disagree.

There is nothing in this record to suggest that the officers had information that the murder weapon was in Selby's possession. He did not fire the fatal shot, he was not even reported to have been armed at the murder scene, and nothing suggests that the police had information that the shooter gave Selby the weapon after the shooting. The mere fact that the shooting occurred and the murder weapon was not recovered does not establish that Selby was in possession of it with such certainty that the officers' conduct can be ruled reasonable as a matter of law. "[O]fficers must have more than a mere hunch or suspicion before an exigency can excuse the necessity for knocking and announcing their presence. . . . [W]e will closely scrutinize officers making a forced entry without first adequately announcing their presence and purpose." Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996) (citations and internal quotation marks omitted).

Moreover, allegations of Selby's past drug dealing and prior arrests for violent crimes do not suspend the knock-and-announce rule. See Richards, 117 S. Ct. at 1421. A reasonable jury could conclude that the reasons offered in support of this search merely "consisted of generalities that bore no relation to the particular premises being searched or the particular circumstances surrounding the search." United States v. Stewart, 867 F.2d 581, 585 (10th Cir. 1989). That conclusion suggests either that the officers' concern that Selby was armed and dangerous was

10

unreasonable or that the officers employed a generalized procedure that was unreasonable as applied to Kornegay's home.

"In order to justify a `no-knock' entry, the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Richards, 117 S. Ct. at 1421 (emphasis added). The ordinary risks that surround a general category of criminal behavior are insufficient by themselves to create an exigent circumstance. See id. (refusing to create a blanket exception to the knock-and-announce rule for felony-drug investigations because of the danger they involve and the ease of destroying drug evidence); see also United States v. Bates, 84 F.3d 790 (6th Cir. 1996); Stewart, 867 F.2d at 584-85."If a per se exception were allowed for each category of criminal investigation that included a considerable--albeit hypothetical--risk of danger to officers or destruction of evidence, the knock[-]and-announce element of the Fourth Amendment's reasonableness requirement would be meaningless." Richards, 117 S. Ct. at 1421.

In United States v. Stewart, federal agents obtained a warrant to search the defendant's house for drugs and weapons based on evidence that he had supplied the drugs involved in two previous undercover purchases and that "substances traffickers do commonly possess and carry a firearm." Stewart, 867 F.2d at 582. The search was executed by the Denver S.W.A.T. team in accordance with the pre-arranged plan to use "a two-man steel battering ram to break down the front door and [then] immediately [throw] a full charge stun grenade into the living room." Id. at 583. Before breaking in the door, the S.W.A.T. team did not knock and announce its presence. The subsequent search uncovered drugs and other paraphernalia, cash, and a loaded, semi-automatic pistol. Stewart entered a conditional plea of guilty to distributing cocaine but reserved the right to appeal the denial of his motion to suppress. In the appeal that followed, the court of appeals reversed. It reasoned, in part, that

11

[t]he officers had no information that would have led them to believe that the defendant armed himself on a regular basis. The officers thus had no information whether firearms were present within the house. The one incident involving the defendant and a pistol took place away from the defendant's house. [Thus a]ny conclusions regarding the presence of firearms on the premises were purely conjectural.

Id. at 585. The same situation exists here with regard to the officers' concern that Selby was armed, and it was therefore for a jury to determine the reasonableness of this entry as a matter of fact and not for a court to determine as a matter of law.

Richards makes clear that the risks generally surrounding murder investigations did not necessarily create an exigent circumstance in this case. See Richards, 117 S. Ct. at 1421. We recognize that, as a practical matter, officers effectuating an entry into a criminal suspect's home might prefer to do so without first announcing their presence. However, the Constitution simply does not permit that practice in all instances. Consequently, officers who act unreasonably cannot place themselves beyond exposure to liability nor complain if they are held accountable by persons such as Kornegay merely because the more "prudent" entry is the unannounced one. Often it is "reasonable" under a section 1983 analysis to choose that method of entry. However, in view of the weighty Fourth Amendment concerns at stake and the sanctity of one's dwelling, it will not always be so. Indeed, section 1983 liability for violations of the Fourth and Fourteenth Amendments would be all but eviscerated if we were to hold that an unannounced entry into one's home is always "reasonable" because it provides a greater measure of safety to police.5 Cf. id. ("[T]he fact that felony drug investigations may frequently present circumstances warranting a no-knock entry cannot remove from the neutral scrutiny of a reviewing court the reasonableness of

_____

5. Of course, we do not suggest that these officers ought to be liable under section 1983. We only hold that a jury must assess the reasonableness of their conduct.

12

the police decision not to knock and announce in a particular case.").

Nothing in the record before us suggests that the officers here had information that Selby regularly carried a weapon or kept weapons in his home. The officers merely knew that Selby was a "known drug dealer with previous arrests for felonies including Robbery First Degree and Possession of a Deadly Weapon During the Commission of a Felony." App. at 47. A reasonable jury could conclude that this information was not sufficiently particular to excuse the officers' failure to knock and announce their presence before breaking down the door to Kornegay's home. "An individual's privacy interests are nowhere more clearly defined or rigorously protected by the courts than in the home the core of fourth amendment rights." Wanger v. Bowner, 621 F.2d 675, 681 (5th Cir. 1980) (citing Payton v. New York, 445 U.S. 573, 589 (1980)).

As noted above, the officers knew that Selby had not shot the murder victim nor did they have evidence that he possessed the gun that was used. Moreover, the officers had conflicting evidence about whether Selby was even involved in the murder of Morgan. Two witnesses placed him at the scene of the murder, but only one said that he had played any role in it.

Finally, a jury could find that any exigency surrounding the circumstances of this case was eliminated by the officers' decision to execute the search at 6:00 a.m. One of the officers who executed the warrant explained that the reason the CMTT selected that time was because "usually the person is in bed . . . for [our] safety we do [them] at that time, there [are] no people on the street . . . the school children [are not] out or anything like that, and . . . to get the people in bed." App. at 84 (emphasis added).

Thus, we cannot conclude on the facts of this case that there is no issue of material fact as to whether the CMTT's execution of the search violated clearly established constitutional rights of which a reasonable person would have been aware.

13

IV.

For the reasons set forth above, we reverse the district court's grant of summary judgment on Kornegay's claim that the CMTT's execution of the search violated the Fourth and Fourteenth Amendments but affirm the grant of summary judgment on her other claims. We remand to the district court for further proceedings consistent with this opinion.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

14