

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-24-1997

# Sharrar v. Felsing

Precedential or Non-Precedential:

Docket
96-5375

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Sharrar v. Felsing" (1997). *1997 Decisions.* Paper 252.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/252

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed October 24, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5375

RONALD E. SHARRAR; GERARD A. SWEENEY;
DAVID L. BRIGDEN; KENNETH J. SHARRAR,

v.

DENNIS FELSING, SGT., Individually and as an officer of
the Sea Isle City Police Department; WILLIAM KENNEDY,
DETECTIVE SGT., Individually and as an officer of Sea
Isle City Police Department; ALBERT WILSON, LT.,
Individually and as an officer of the Sea Isle City Police
Department; MICHAEL LARKIN, SGT., Individually and
as an officer of the Sea Isle City Police Department;
CITY OF SEA ISLE

Ronald E. Sharrar, Gerard A. Sweeney,
David L. Brigden and Kenneth L. Sharrar,
       Appellants

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 94-cv-01878)

Argued May 23, 1997

Before: SLOVITER, Chief Judge, ROTH, Circuit Judge and
POLLAK,* District Judge

(Filed October 24, 1997)

_____
* Hon. Louis H. Pollak, United States District Court for the Eastern
District of Pennsylvania, sitting by designation.


        Jane M. Shields (Argued)
        Sherilyn M. Arnold
        Siana, Shields & Vaughan
        Exton, PA 19341

         Attorneys for Appellants

        Steve Drake (Argued)
        Savio, Reynolds & Drake
        Absecon, N.J. 08201

Attorneys for Appellees

OPINION OF THE COURT

SLOVITER, Chief Judge.

Ronald Sharrar, Kenneth Sharrar, David Brigden and
Gerard Sweeney brought this civil rights action pursuant to
42 U.S.C. S 1983 against police officers Lt. Albert Wilson,
Sgt. Michael Larkin, Sgt. William Kennedy, Sgt. Dennis
Felsing, and the City of Sea Isle, New Jersey, alleging
unlawful arrest, arrest with excessive force, and two illegal
searches. After the district court granted summary
judgment to the defendants on all claims except for the
second allegedly illegal search, a magistrate judge
conducted a jury trial on the remaining claim against Sgts.
Larkin and Kennedy. The jury found that the search was
conducted without a warrant but that Sgt. Kennedy had
not participated in the search and that Sgt. Larkin had a
reasonable belief that he had a warrant so was entitled to
qualified immunity.

The plaintiffs appeal the summary judgment order, the
denial of their Motion for Judgment as a Matter of Law, and
the submission of a special interrogatory to the jury with
respect to Sgt. Kennedy's role in the illegal search. Plaintiffs
do not appeal dismissal of their claims against the City.

On this appeal, we must consider plaintiffs' contentions
that the court erred in disposing of certain claims by
summary judgment and in its handling of the one claim

2

that reached the jury. We must also reach the issue of
qualified immunity, which had been sought by the
defendants although not fully addressed by the district
court.

I.

BACKGROUND

A.

Facts

As to those portions of this case that were decided by
summary judgment, we set forth the undisputed facts as
revealed by the record, which is comprised almost entirely
of deposition testimony, and the plaintiffs' version of the

facts when there are disparities. See In re City of Philadelphia Litigation, 49 F.3d 945, 949 (3d Cir.), cert. denied, 116 S. Ct. 176 (1995). We also refer to additional facts adduced at the trial which was held on the claim based on the second search.

On October 1, 1992 at approximately 12:10 p.m. Patricia Gannon-Brigden (referred to here as Patricia Gannon) called 911 and said "I had somebody come into my apartment and beat me up. I'm bleeding pretty bad." App. at 152. When the dispatcher asked who beat her up she replied "Robert Carroll." The dispatcher asked for clarification and Gannon repeated two more times that it was Robert Carroll who beat her up. Id. The dispatcher asked if he was still there and Gannon replied "No, he left. And three other people were here with him. I'm bleeding. I have blood all over me. There is blood everywhere." App. at 152-53. The dispatcher then told Sgt. Felsing, who was in the room with the dispatcher, that "There is a woman beat up by Robert Carroll." App. at 153. Sgt. Felsing's response was inaudible and in deposition he testified that he never heard the dispatcher mention the name Robert Carroll.

When Sgt. Felsing arrived at Gannon's apartment she told him that she had been hit, and he saw a two-inch

3

laceration on her scalp, a pool of blood on the kitchen floor, blood on a pillow in the bedroom and blood in her hair. There were no signs of a forced entry or any broken objects in the apartment. She told Sgt. Felsing "that her [estranged] husband, David Brigden, and three others had come into the house, that they held her while David pulled a gun and hit her on the side of the head." App. at 250. She said that Brigden was being investigated by the FBI for bringing drugs into town, and that he told her that he was afraid that she had gone to the FBI, and that "she wouldn't be the first body he's thrown in the river and they haven't found. He hit her and that's the last she remembered." App. at 255. Gannon did not identify or describe the other three men to Sgt. Felsing.

An ambulance arrived soon after, as did Sgt. Larkin and Capt. Kevin McClory. Sgt. Larkin stated that "Officer Felsing indicated to me that [Gannon's] ex-husband entered the condominium while two of her [sic] friends held her down, he struck her with a handgun, and there was another person involved, that he was standing by the door, and he indicated that [Gannon] said that after they left, they jumped into the brown van and they went back to 49th Street." App. at 297. Neither Sgt. Larkin or Capt.

McClory spoke with Gannon.

Gannon was taken to the hospital and was admitted at approximately 1:09 p.m. About the same time, Sgt. Larkin dispatched Sgt. Felsing to Brigden's home on 49th Street to see whether the van was there. Sgt. Felsing radioed Sgt. Larkin to tell him that the van was in front of Brigden's residence and then parked his car on another street and walked to the northwest corner of 49th Street and waited. Sometime thereafter, while Sgt. Felsing was at the property, Kim Candle, a resident of one of the units in the building, came out and Sgt. Felsing asked her if Brigden was in the house. She responded that she had heard noise downstairs "so she knew they were there." App. at 263.

Sgt. Larkin also proceeded to Brigden's residence and radioed the license number of the van to the dispatcher, who confirmed that it was Brigden's van. At approximately 1:30 p.m. Capt. McClory arrived and Sgt. Larkin suggested that they seek reinforcements. Capt. McClory agreed and

4

Sgt. Larkin called the dispatcher and told him to call Lt. Wilson, "who was in charge of the tactical unit," and off-duty officers. App. at 298. It took approximately a half hour to forty-five minutes for all the reinforcement officers to arrive.

A "temporary command post" was set up at the 49th Street corner where the officers assembled in a variety of police vehicles. App. at 345. City of Sea Isle Mayor Michael McHale arrived, as did Police Commissioner Libro. FBI agent Jack Reemer was called to the scene as a trained hostage negotiator. Two officers from the Sheriff 's Department arrived. Additional officers from the Avalon and Ocean City Police Departments arrived, as did several officers with drug/explosives sniffing dogs. Lt. Wilson, the officer in charge of the SWAT team, arrived with the entire eight member SWAT team, who were dressed in black fatigue uniforms and armed with shotguns, rifles and submachine guns. App. at 405-06.

The police created an inner and outer perimeter around Brigden's residence. Capt. McClory ordered the evacuation of all residents in the inner perimeter. He dispatched someone to contact the schools in the area to divert their normal bus routes and keep at school all children who lived in the immediate vicinity of Brigden's residence. App. at 310. The fire station was ordered to accept evacuees, app. at 145; fire trucks and ambulances were told to come to the scene without lights and sirens; the City marina was closed

so that no boats could leave the harbor; and the bridge which provided the sole vehicular access to the City was blocked.

Once the inner perimeter was cleared, Lt. Wilson assigned duties to members of the tactical team. Officer Rock, who was "the department sniper," and another officer were stationed at a nearby building. App. at 350. Sgt. Larkin, Lt. Wilson and at least three other officers were assigned to the rear of the residence. Sgt. Kennedy was sent to the front of the residence in order to watch the front door. Lt. Wilson then told Sgt. Felsing to go to a nearby house and call Brigden. Sgt. Felsing was accompanied by the FBI hostage negotiator.

5

Sometime between 2:30 and 3:20 in the afternoon, Gerard Sweeney, who along with Ronald and Kenneth Sharrar was staying with Brigden for a few days, looked out a sliding glass door and saw an armed man in black fatigues in the backyard. Frightened, he yelled "David, call the police." App. at 121. Brigden stated that "I looked out the back window and there was a fellow there kneeling, dressed in black with a shotgun pointed at the house. And I then went to the side window and looked out the side window and saw a man there with a machine gun. . . ." App. at 129.

When Brigden picked up the phone to call the police, Sgt. Felsing was already on the line. Sgt. Felsing identified himself, told Brigden that the house was surrounded by police, that they had reason to believe he had committed an assault, and wanted him to "send his people out" one by one backwards out the back door and then for him to come out. App. at 262. Brigden stated that while he was on the phone he could hear men screaming for them to come out backward with their hands on their heads.

The four men complied and walked out backwards one at a time into the backyard and were ordered to lie face down in the dirt. They allege that the police yelled and "threatened to blow our brains out if we made one wrong move." App. at 114. Sweeney stated that the police yelled: "You move, I will blow your . . . fucking heads off." App. at 122. Kenneth Sharrar stated that once on the ground the police "came up and were yelling, where's the fucking gun. Stuck a gun in the back of my head, put their knee in my back." App. at 115. Ronald Sharrar claimed the police yelled at him to "[k]eep your fucking head down or I'll blow it the fuck off," and repeated that threat three to five times. App. at 105.

By 3:20 p.m. the four men were handcuffed, frisked, and taken to the police station. According to Lt. Wilson, once the four were taken into custody "[t]he tactical unit immediately entered the building and cleared it to make sure there were no other suspects still hiding inside." App. at 429.

Brigden's residence consisted of a three story single-family house that had been converted into four separate

6

locked and numbered apartment units. The first floor contained two apartments, one of which was occupied by Brigden. There were separate apartments on the second and third floors. The officers admitted that they knew that the other units were rented to other people.

Lt. Wilson testified that he and the SWAT team cleared the building by entering each room in the entire building to make sure there were no other suspects. The Mayor of the City of Sea Isle also entered the building during this sweep. Lt. Wilson then secured the residence so that no one would enter the premises again until a search warrant was procured. This sweep took somewhere between five and twenty minutes.

The precise sequence thereafter is unclear. At Sgt. Kennedy's deposition he stated that he and Sgt. Felsing then went to obtain a search warrant from Municipal Court Judge Kenneth Calloway, that he met with Judge Calloway and, before he had anything in writing, told him what had occurred and asked for a "no knock search warrant" for the premises and all vehicles on the premises. App. at 361-63. Sgt. Kennedy then claimed that Judge Calloway gave him oral permission to search the premises and told him to supply the necessary paperwork later. App. at 364. Sgt. Kennedy informed Lt. Wilson that Judge Calloway had authorized the search warrant and that the premises could be searched. Sgt. Kennedy went back to Brigden's residence and conducted a "walk-through of the scene" at the same time that Sgt. Larkin, pursuant to Lt. Wilson's direction, conducted the search. He was accompanied by several other police officers, county sheriffs, and dogs. Sgt. Kennedy then returned to the police station where he formally transcribed the information he previously had given to Judge Calloway and placed it in a search warrant application. Judge Calloway signed the search warrant at approximately 7:30 p.m., after both the sweep and the entire search had been completed. At Judge Calloway's deposition, taken shortly after Sgt. Kennedy's deposition,

Judge Calloway testified that he did not remember "ever giving a verbal search warrant or authorization to do anything." App. at 530.

At the trial, Sgt. Kennedy acknowledged that he had testified at his deposition that he had received an oral warrant from Judge Calloway, and transmitted that information to the officers at the residence. However, he stated that his recollection had been refreshed by review of the telephonic transmission. App. at 844-45. He testified, or at least suggested, that the search was instituted following a telephone call during which Lt. Wilson, who was at the scene, was advised by Capt. Devlin that he had received a telephonic or oral warrant from Judge Calloway. App. at 832-34, 836, 839-41.

The next day the four plaintiffs were arraigned before Judge Calloway and were charged with burglary, assault, making terroristic threats and conspiracy. All of the charges were eventually dismissed.

B.

Procedural History

In their S 1983 complaint, the four plaintiffs sued Sgt. Felsing, Sgt. Kennedy, Sgt. Larkin and Lt. Wilson for violation of the Fourth and Fourteenth Amendments for arresting them without probable cause, unreasonable search and seizure, and use of excessive force. They also brought a S 1983 claim against the City of Sea Isle for fostering a policy which resulted in the constitutional violations by the police force.

After discovery, the plaintiffs filed a motion for summary judgment. The defendant officers and the City then filed their own motion for summary judgment. On March 7, 1996, the district court entered an order, accompanied by an opinion, denying the plaintiffs' motion and granting the defendants' motion in part.

The district court held that the police had probable cause to arrest, that the arrest occurred in a public place so no warrant was required, that the excessive force claim only involved an alleged injury to Ronald Sharrar's shoulder which could not be attributed to any of the defendants, and that the police's initial warrantless search of Bridgen's

residence was an acceptable protective sweep. As for the second more extensive search, the court referred to it as a warrantless search, and did not find any exceptional circumstances present to justify conducting a warrantless search. Dist. Ct. Op. of March 7, 1996 at 14. It held, however, that the only named defendants who were implicated in this search were Sgts. Larkin and Kennedy and declined to grant summary judgment for plaintiffs as to these defendants because there was a genuine issue of material fact as to whether they were entitled to qualified immunity based on their belief that they had an oral search warrant. Finally, the district court granted summary judgment for the City, finding that the plaintiffs failed to present any evidence of a custom or policy of violating constitutional rights.

A magistrate judge presided over the jury trial which was held against Sgts. Larkin and Kennedy on the claim involving the second search. Following the presentation of evidence, plaintiffs filed a Motion for Judgment as a Matter of Law on the issue of qualified immunity, which the magistrate judge denied. The magistrate judge then submitted the illegal search claim to the jury along with special interrogatories. The jury found that the search of the premises was unlawful but returned a verdict in favor of the defendants, finding that Sgt. Larkin had a good faith belief that he was authorized to search the premises and that Sgt. Kennedy was not liable because he did not enter and search Brigden's residence.

II.

SUMMARY JUDGMENT

We exercise plenary review over a district court's order granting summary judgment, applying the same test as the district court should use in the first instance, to determine if there are any issues of material fact which would allow the issue to go to trial. See Fed. R. Civ. P. 56; Hamilton v. Leavy, 117 F.3d 742, 746 (3d Cir. 1997). The plaintiffs, as the non-moving parties, are entitled to every favorable inference that can be drawn from the record. Id.

9

A.

The Arrests

1. Probable Cause

Plaintiffs first argue that there was no probable cause to arrest them or at least that it should have been a question for the jury. Probable cause is "defined in terms of facts and circumstances `sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). This standard is meant to " `safeguard citizens from rash and unreasonable interferences with privacy' " and to provide "leeway for enforcing the law in the community's protection." Id. at 112 (quoting Brinegar v. United States, 338 U.S. 160, 176 (1949)).

We have stated that "[t]he determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the officers at the scene. It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense [had been] committed." United States v. Glasser, 750 F.2d 1197, 1206 (3d Cir. 1984), cert. denied, 471 U.S. 1018 (1985). A court must look at the "totality of the circumstances" and use a "common sense" approach to the issue of probable cause. Id. at 1205 (citing Illinois v. Gates, 462 U.S. 213 (1983)).

In a S 1983 action the issue of whether there was probable cause to make an arrest is usually a question for the jury, but "where no genuine issue as to any material fact exists and where credibility conflicts are absent, summary judgment may be appropriate." Deary v. Three Un-Named Police Officers, 746 F.2d 185, 192 (3d Cir. 1984). The question is for the jury only if there is sufficient evidence whereby a jury could reasonably find that the police officers did not have probable cause to arrest. Id. at 190.

Sgt. Felsing responded almost immediately to Gannon's 911 call and found her injured and bleeding. She identified

10

her husband David Brigden as her attacker, stated that he was assisted by three other men, and also stated that they all left in a brown van to return to Brigden's residence. Sgt. Felsing then drove to Brigden's residence and saw a brown van parked in the driveway that was positively identified by the license tag as belonging to Brigden. Because of the close proximity to the alleged attack, both in time and distance, the police had probable cause to arrest Brigden, whom the victim had identified, and the three men who

were still with Brigden on the reasonable inference that they were the same three men who had participated in the assault.

The plaintiffs argue that Gannon's initial identification of "Robert Carroll" as her assailant was enough to undermine her credibility in the eyes of the police and creates a genuine issue whether the police had probable cause to arrest based on her subsequent identification of Brigden. They cite authority which they claim required the police to assess her reliability.

The cases on which plaintiffs rely involve informers, not victims. "[T]he skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim. . . ." Easton v. City of Boulder, 776 F.2d 1441, 1449 (10th Cir. 1985), cert. denied, 479 U.S. 816 (1986). The district court explained, and we agree, that "[t]he cloistered nature of domestic violence is such that the testimony of the battered spouse and the injury itself may be the only evidence available to establish probable cause." Dist. Ct. Op. at 8.

Furthermore, there is no evidence that Sgt. Felsing heard Gannon's initial claim that Robert Carroll attacked her. Even if he had heard, it was reasonable for Sgt. Felsing to assess Gannon's demeanor, find her story credible, and rely on her subsequent identification of her husband as the attacker. When a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause to arrest. See Torchinsky v. Siwinski, 942 F.2d 257, 262 (4th Cir. 1991) ("It is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker."); Grimm v.

11

Churchill, 932 F.2d 674, 675 (7th Cir. 1991) ("When an officer has received his information from some person-- normally the putative victim or an eye witness--who it seems reasonable to believe is telling the truth, he has probable cause." (internal quotations omitted)).

Ronald Sharrar, Kenneth Sharrar and Gerard Sweeney argue that even if there was probable cause to arrest David Brigden based on Gannon's identification, there was not sufficient evidence to arrest them. They cite the Supreme Court decision in Ybarra v. Illinois, 444 U.S. 85, 91 (1979), for the proposition that "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause. . . ." In Ybarra,

a search warrant was issued to search a bar on the suspicion that a bartender was involved in drug sales. The police arrived and frisked all patrons based solely on their presence at the public tavern. Ybarra, a patron, sought to exclude evidence which was recovered from his person during this search. The Supreme Court held that the search violated the Fourth Amendment because the police had no facts which would support a suspicion that Ybarra had violated the law or that he was armed and presently dangerous. See id. at 91-93.

Ybarra is inapposite. This is not a case where Ronald Sharrar, Kenneth Sharrar and Gerard Sweeney were arrested based on their "mere propinquity" to Brigden. Rather, they were arrested based upon an assault victim's description of her attack, which included a clear identification of her husband and the statement that he was accompanied by three other men who all left in a brown van to go to Brigden's house. In less than an hour from the time of the 911 call, Sgt. Felsing observed that van outside of Brigden's house and learned from another resident of the building that Brigden may not be alone. These facts support a finding of probable cause to arrest all four plaintiffs.

2. Warrantless Arrest

Plaintiffs next contend that their arrests were illegal, even if probable cause existed, because the arrests occurred within their home unaccompanied by a warrant. Although

12

police may make a warrantless arrest in a public place if they have probable cause to believe the suspect is a felon, "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980).

The district court found that the arrests occurred in a public place so no warrant was required: "[T]he police telephoned the plaintiffs at home and asked them to come out. They consented to do so and were arrested outside, in a public place, at the moment the police took physical custody of them." Dist. Ct. Op. at 9. Thus, notwithstanding that the court recognized that "a substantial amount of coercion motivated plaintiffs' consent," id., the court found there to be no jury issue.

The point at which an arrest occurs has been the subject of considerable judicial line-drawing. In Terry v. Ohio, 392

U.S. 1, 19 n.16 (1968), the Supreme Court defined a seizure as "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. . . ." Later, in I.N.S. v. Delgado, 466 U.S. 210, 215 (1984), the Court explained that a person has been seized within the meaning of the Fourth Amendment "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (internal quotations omitted). In the most recent decision on the issue, the Supreme Court in California v. Hodari D., 499 U.S. 621, 626 (1991) explained that "[a]n arrest requires either physical force . . . or, where that is absent, submission to the assertion of authority." (emphasis in original).

Under any of these tests, when a SWAT team surrounds a residence with machine guns pointed at the windows and the persons inside are ordered to leave the house backwards with their hands raised, an arrest has undoubtably occurred. There was a clear show of physical force and assertion of authority. No reasonable person would have believed that he was free to remain in the house. We hold that under these circumstances the arrests occurred inside Brigden's home. See United States v. Al-Azzawy, 784 F.2d 890, 893 (9th Cir. 1985) (arrest occurred

13

in the home when police surrounded the residence and ordered the person out with a bullhorn), cert. denied, 476 U.S. 1144 (1986); United States v. Maez, 872 F.2d 1444, 1450 (10th Cir. 1989) (where SWAT team surrounded trailer with rifles pointed and ordered suspect to exit, arrest occurred in home despite lack of physical entry). Therefore, the police were required to have secured an arrest warrant unless there were exigent circumstances. See Payton, 445 U.S. at 590.

The district court held that even if the arrests occurred indoors, exigent circumstances justified the warrantless arrests. The government bears the burden of proving that exigent circumstances existed: "Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." Welsh v. Wisconsin, 466 U.S. 740, 750 (1984).

In explicating further on the type of exigent circumstances that would justify a warrantless entry into a person's home, the Court quoted the Minnesota Supreme Court with approval where it stated: "a warrantless

intrusion may be justified by hot pursuit of afleeing felon,
or imminent destruction of evidence, . . . or the need to
prevent a suspect's escape, or the risk of danger to the
police or to other persons inside or outside the dwelling."
Minnesota v. Olson, 495 U.S. 91, 100 (1990) (internal
quotations omitted); see United States v. Velasquez, 626
F.2d 314, 317 (3d Cir. 1980).

There is an insufficient basis on this record to hold, as
the district court did, that exigent circumstances existed as
a matter of law. There is nothing in the record to support
a theory of "hot pursuit," a fear that the suspects would
flee, or a fear that evidence would be destroyed. It appears
that, at most, the police believed that the suspects posed a
danger because Gannon said she had been hit with a gun.
The mere possession of a gun, which as far as the officers
knew had been used only once and then against Brigden's
wife, no matter how grievous a crime, does not necessarily
show exigent circumstances. The police have not
satisfactorily explained why, when the house was

14

completely surrounded by an armed SWAT team, they
could not secure the premises while they went to procure
an arrest warrant, especially in light of the fact that
Municipal Court Judge Calloway was sitting on the bench
at the police station during this entire episode.

The issue of exigent circumstances in these
circumstances would be one for the jury. See, e.g., Bodine
v. Warwick, 72 F.3d 393, 399 (3d Cir. 1995) (issue of
whether exigent circumstances existed should go to jury
when there are disputed factual issues). However, there is,
at most, evidence that only two of the defendants were
involved in the arrest. Sgt. Felsing may be viewed by a fact
finder as having effected the arrest by telephoning the order
to exit to the plaintiffs, and he apparently did so under the
direction of Lt. Wilson, the officer in charge of the
operation. Thus, in summary, we cannot affirm the district
court's disposition of the plaintiffs' claims based on that
court's view that the arrests raised no constitutional issue.

B.

Excessive Force

We turn next to plaintiffs' contention that the district
court erred in holding that there was insufficient evidence
to present a jury issue on their claim that excessive force
was used to arrest them. When an "excessive force claim
arises in the context of an arrest or investigatory stop of a

free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right `to be secure in their persons . . . against unreasonable . . . seizures' of the person." Graham v. Connor, 490 U.S. 386, 394 (1989). The proper test for evaluating an excessive force claim is therefore one of objective reasonableness. See id. at 397.

This objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. See also

15

Groman v. Township of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995). Significantly, the Supreme Court has cautioned that in applying the objective reasonableness test, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," is constitutionally unreasonable. 490 U.S. at 396 (internal quotations omitted). Rather, "[t]he calculus of reasonableness must embody allowance for the fact that `police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.' " Id. at 396-97.

In granting summary judgment, the district court held that only Ronald Sharrar alleged any physical injury and that that injury could not be attributed to any of the defendant officers. On appeal the plaintiffs argue that Lt. Wilson, as the on-scene commander and SWAT team leader, may be held liable for acquiescing in the unconstitutional conduct of his subordinate officers, even if he was not directly responsible for Ronald Sharrar's injuries. Plaintiffs also argue that their excessive force claim involves not just Sharrar's physical injury, but the entire level of force and verbal abuse used in the arresting process: deploying the SWAT team, forcing plaintiffs to lie face down in the dirt, and threatening that if they moved the police would "blow [their] . . . fucking heads off." App. at 122.

Ronald Sharrar, the only plaintiff who alleged any physical injury, stated in deposition that the injury to his shoulder occurred after he was placed in the police car: "My handcuffs were grabbed from behind and my arms were lifted up from behind. . . .My shoulder came partially out of the socket." App. at 105-06. The claims of the other

plaintiffs are limited to "emotional distress, humiliation" and "public scorn and derision." Complaint, App. at 30.

Ronald Sharrar, who could recognize all of the defendant officers, was unable to identify which police officers were in the police car with him at the time of the alleged abuse. There was therefore no evidentiary basis on which to hold these defendants liable. Plaintiffs argue that Lt. Wilson may be liable under the cases holding that a police officer may

be liable for violating an arrestee's rights not only if he personally participates in the violation, but also if he directs others to so violate, or had knowledge of and acquiesced in his subordinates' violations. See Baker v. Monroe Township, 50 F.3d 1186, 1190-91 (3d Cir. 1995). However, there is no evidence in the record to suggest that Lt. Wilson, as the officer in charge, had any knowledge of the alleged incident in the police car. Therefore, we will not disturb the district court's determination that the conduct leading to Ronald Sharrar's injury could not be attributed to Wilson.

Turning next to the extent of force employed in effecting the four arrests, it is incontestable that the display of force used to apprehend the four men for an alleged domestic assault, albeit with a gun, appears extreme. It entailed calling over twenty officers to the scene, including a SWAT team armed with machine guns and an FBI hostage negotiator. It does not follow, however, that the extreme methods used in effecting the arrests, such as requiring plaintiffs to lie face down in the dirt, with guns to their heads and vulgar threats, were constitutionally excessive, even though they caused plaintiffs' discomfort and humiliation. Although there are decisions of this court that have found the use of force excessive, notwithstanding the absence of extensive physical contact and permanent physical injury, the circumstances here are distinguishable.

In Black v. Stephens, 662 F.2d 181 (3d Cir. 1981), cert. denied, 455 U.S. 1008 (1982), we sustained a jury verdict in a case where a plain-clothed police officer brandished and pointed a revolver at plaintiff and his wife during what was at that time only an investigatory stop. However, in that case there had been no basis for plaintiff to know that the gunman was a police officer or that an arrest would eventually be effected. And in Baker v. Monroe, 50 F.3d at 1193, where police officers ordered those approaching a house that was the subject of an incipient drug raid to "get down," pushing them to the ground, while using handguns, we reversed the district court's grant of summary judgment

and suggested that the officers' actions could constitute a constitutional violation. See also McDonald v. Haskins, 966 F.2d 292, 294 (7th Cir. 1992) (finding a violation of the

Fourth Amendment when a police officer aimed a gun at a passive nine-year-old boy and threatened to pull the trigger).

The Supreme Court made clear in Graham that each case alleging excessive force must be evaluated under the totality of the circumstances. The district court here focused only on the presence vel non of physical injury. We do not agree that the absence of physical injury necessarily signifies that the force has not been excessive, although the fact that the physical force applied was of such an extent as to lead to injury is indeed a relevant factor to be considered as part of the totality. See Gumz v. Morrissette, 772 F.2d 1395, 1400-01 (7th Cir. 1985) (holding that, under substantive due process standard, excessive force claim must be "so egregious as to be constitutionally excessive, and the presence of some physical injury is certainly relevant to that determination"), cert. denied, 475 U.S. 1123 (1986), overruled, Lester v. City of Chicago, 830 F.2d 706, 712-14 (7th Cir. 1987). Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

In this case, the officers were arresting four men, they had been advised that at least one of the men, with the assistance of others, had used a gun in a violent episode which was still unaccounted for, there had been some suggestion that they may have been involved with drugs, and there is no allegation that the requirement that the suspects lie down extended beyond the time necessary to handcuff them and secure them. While the language and method used to effect the arrests appear to be more akin to the Rambo-type behavior associated with police in overdramatized B movies or TV shows than the police conduct ordinarily expected in a quiet, family seaside town, we are reluctant to establish a precedent that would subject every police arrest of a group of possible violent offenders to compliance with Marquis of Queensberry Rules of fair play. Although these police officers came close to the line, these

circumstances, in totality, do not rise to a Fourth Amendment violation. Therefore, we will not hold erroneous the district court's grant of summary judgment to the police officers on the plaintiffs' claim of excessive force.

C.

The Searches

1. The "Protective Sweep"

The plaintiffs also argue that the district court erred when it held constitutionally permissible the "protective sweep" of the premises conducted by the defendants after plaintiffs were arrested but before defendants procured a search warrant. The Supreme Court has defined a protective sweep as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." Maryland v. Buie, 494 U.S. 325, 327 (1990). The sweep must be limited to a search of "closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 334. If the search goes beyond the immediately adjoining areas, there must be "articulable facts" which would warrant a reasonably prudent officer to believe that there are individuals who pose a danger in other areas of the house. See id. at 334.

In this case, the officers sought to justify their warrantless entry into Brigden's unit immediately following effecting the arrest by telephone on the ground that it was a quick protective sweep incident to the arrest and needed to protect the safety of the officers involved. The officers contend they entered the residence seeking to determine that there were no other accomplices hiding in the building with access to the gun that remained unaccounted for. Although they swept more broadly than Brigden's unit, we need not decide whether the sweep of the remainder of the four-unit building was justified because these plaintiffs, who were overnight guests of Brigden, only had a privacy interest in Brigden's unit and lack standing to challenge a search of other persons' apartments. Olson, 495 U.S. at 95 (Fourth Amendment protects from unreasonable searches

19

only those places where persons have a legitimate expectation of privacy).

We note as an initial matter that we are not dealing with

a criminal case where the admissibility of evidence found during a protective sweep following an unconstitutional arrest would lead to suppression of the evidence as fruits of the unconstitutional arrests. Under the jurisprudence of this court, the validity of the search for purposes of a S 1983 suit must be examined independently of the lawfulness of the arrests. See generally, Bodine, 72 F.3d at 400 (in a S 1983 case, questions of reasonableness and constitutionality of officers' conduct once inside the home were not dependent on whether officers' entry into the home was lawful since officers are liable in tort only for injury proximately caused by their unreasonable conduct).

In Maryland v. Buie, the Supreme Court's seminal decision on this issue, the Court explained why a protective sweep "incident to [an] arrest" was permissible under the Fourth Amendment notwithstanding it was "without probable cause or reasonable suspicion." 494 U.S. at 334. The Court explained:

> In the instant case, there is an . . . interest of the officers in taking steps to assure themselves that the house in which the suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. .. . A protective sweep . . . occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surrounding.

Id. at 333 (emphasis added). In addition, the Court noted that

20

> the arrest warrant gave the police every right to enter the home to search for Buie. Once inside, the potential for danger justified a standard of less than probable cause for conducting a limited protective sweep.

Id. at 334 n.1 (emphasis added). Finally, the Court cautioned that, unlike an evidentiary search, "a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection

of those spaces where a person may be found." Id. at 335.

Although this court has never ruled on the circumstances in which a protective sweep of a home, as defined in Buie, would be permissible as incident to an arrest occurring just outside the home, those circuits that have addressed the issue have uniformly held that the reasoning of Buie is also applicable and that under those circumstances, protective sweeps of the home in such situations are not per se unreasonable, see, e.g., United States v. Colbert, 76 F.3d 773, 776-77 (6th Cir. 1996); United States v. Henry, 48 F.3d 1282, 1284 (D.C. Cir. 1995); United States v. Kimmons, 965 F.2d 1001, 1009-10 (11th Cir. 1992), cert. denied, 506 U.S. 1086 (1993), cert. granted and judgment vacated on other grounds, Small v. United States, 508 U.S. 902 (1993), judgment reinstated, United States v. Kimmons, 1 F.3d 1144 (11th Cir. 1993); United States v. Oguns, 921 F.2d 442, 446 (2d Cir. 1990); United States v. Tisdale, 921 F.2d 1095, 1097 (10th Cir. 1990), cert. denied, 502 U.S. 986 (1991). Those courts also agree that a sweep incident to an arrest occurring just outside the home must be analyzed under the second prong of the Buie analysis requiring "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 334.

Like our sister circuits, we see no reason to impose a bright line rule limiting protective sweeps to in-home arrests, as we agree with the Colbert court that "in some circumstances, an arrest taking place just outside a home may pose an equally serious threat to the arresting officers." 76 F.3d at 776. Certainly, it would be imprudent

21

to prohibit officers who are effecting an arrest or waiting until a warrant may be obtained from ensuring their safety and minimizing the risk of gunfire or other attack coming from inside the home if they have reason to believe that dangerous individuals are inside. Therefore, in order to determine whether the protective sweep in question met the standard enunciated by the Supreme Court in Buie, we must consider whether there was an articulable basis for a protective sweep, i.e., a warrantless search, under the circumstances at that time.

Predictably, where the courts have differed in permitting protective sweeps incident to arrests outside the home is on the quantity and quality of the articulable facts necessary to justify the sweep, rather than on the underlying

standard. In Oguns, 921 F.2d at 446-47, for example, the Second Circuit upheld a protective sweep following an arrest outside the home where "[e]ven though the agents had been told that Oguns' brother was not in the apartment, they still could have reasonably believed that others were in the apartment." Similarly in Tisdale, 921 F.2d at 1097, the Tenth Circuit upheld a protective sweep following an arrest made outside the home, reasoning that "the fact that defendant fled [from the trailer before being arrested], along with the sounds of gunshots, was ample justification for a protective sweep." In Colbert, 76 F.3d at 777-78, however, the Sixth Circuit invalidated a protective sweep following an arrest made outside the home and after the arrestee's girlfriend frantically ran out of the house to the arrest site because the officers had no information as to whether anyone else was still in the house following the arrest. In so holding, the court reasoned that " `[n]o information' cannot be an articulable basis for a sweep that requires information to justify it in the first place". Id. at 778.

Although the parties before us have not focused on Buie and the standard enunciated there, the officers do contend that the protective sweep was justified in light of the "legitimate fear for their safety given the totality of the circumstances they faced." Appellee's Brief at 24. Admittedly, if the officers had an articulable basis to believe that a confederate of those apprehended was still at large or

within the premises and that a weapon previously sighted and not yet recovered might be available within the premises, the protective sweep could have been justified, see, e.g., Kimmons, 965 F.2d at 1009-10. The reasonable possibility that an associate of the arrestees remains at large to do mischief or cause danger to the officers is the salient, although not necessarily only, concern for which a warrantless protective sweep is justified. The evidence from these defendants themselves, however, negates reliance on these possibilities as the articulable basis for the protective sweep.

The transcript of the events as they were unfolding contains the following dialogue:

    MR. DEVLIN: Somebody from the Prosecutor's Office talked to the wife, there's only one gun involved, it's a pistol in the brown van in front of the house.

    MR. McCLORY: 10-4. Keep them coming out the back.

MR. WILSON: Brigden is not out yet, he should be the fourth individual inside.

MR. FELSING: Felsing to L-8.

MR. McCLORY: If there's any movement to that brown van, let us know.

MR. KENNEDY: I'm right on top of it, I am only 20 feet away from it.

Let's go back to the back, once they are out, we'll get the gun.

MR. FELSING: Felsing to L-8.

MR. WILSON: You got this fourth guy on the phone, Dennis?

MR. FELSING: Got him on the phone.

MR. WILSON: Send him out.

MR. FELSING: 10-4.

Okay he's coming out.

23

MR. McCLORY: C-2 to L-8, I think everybody is clear.

MR. KENNEDY: The one in the front was covered.

MR. WILSON: Tommy, you got the front door?

MR. ROCK: Negative.

MR. WILSON: Stand by.

Dennis, is everybody out?

MR. FELSING: Confirmed.

MR. WILSON: We're ready for transport whenever you are ready.

App. at 1075-76 (emphasis added).

Thus, under the circumstances, the fact that the officers believed that Brigden had brandished a pistol cannot, on its

own, constitute sufficient "articulable facts" as required under Buie for two reasons. First, it implies nothing regarding the possible presence of anyone being in Brigden's home -- the touchstone of the protective sweep analysis. See Colbert, 76 F.3d at 777 (arrestee's dangerousness is irrelevant to the protective sweep analysis once the arrestee is in custody); United States v. Ford, 56 F.3d 265, 269 (D.C. Cir. 1995) (fact that homicide suspect was assumed to be armed and dangerous did not justify protective sweep beyond the immediate area of the arrest). Second and more importantly, at the time of the protective sweep, the officers at the scene had been informed, and believed, that the gun allegedly used in the assault was not in Brigden's residence, but in his van. App. at 1075-79.

Similarly unavailing to the officers is the fact that they had been told that Brigden was accompanied by three accomplices. Once all four men were out of the house and in custody, the arresting officers had no basis, let alone the "articulable facts" required under Buie, to conclude that others remained inside. Indeed, as the transcript reveals, Sgt. Felsing informed Lt. Wilson that everyone was out of the house before the sweep was initiated. App. at 1076.

Because we agree with the court in Colbert that " `[n]o information' cannot be an articulable basis for a sweep that

24

requires information to justify it in the first place," 76 F.3d at 778, we conclude that the Buie "articulable facts" standard was not met in this case, and we cannot sustain the district court's grant of summary judgment for defendants as to the protective sweep.

2. The Subsequent Search

Plaintiffs next challenge the court's disposition of their claims that the subsequent full search of the building, also conducted before a written search warrant was issued, was unconstitutional. Plaintiffs argue that the district court erred when it found that only Sgts. Kennedy and Larkin were implicated in the search, and granted summary judgment to Sgt. Felsing and Lt. Wilson on the ground that "they played no part in the search." Dist. Ct. Op. at 17.

Sgt. Kennedy testified in his deposition that it was Lt. Wilson who ordered Sgt. Larkin to conduct the search. Lt. Wilson stated in his own deposition that he was in the house during the time the search was being conducted, although he claimed that he did not personally search the premises. See App. at 439. Lt. Wilson was the highest

ranking officer at the scene and a reasonable jury could conclude that the search was conducted under his direction. It was therefore improper to grant summary judgment in favor of Lt. Wilson.

However, the only evidence linking Sgt. Felsing to the search was that he, along with Sgt. Kennedy, provided the initial information orally to Municipal Court Judge Calloway in order to procure a search warrant. Nothing suggests that Sgt. Felsing knew that a telephonic or "verbal" warrant, rather than a written warrant, was being procured and there is no evidence that he played any part in the decision to rely on that "verbal" warrant to conduct or authorize the search. Inasmuch as Sgt. Felsing did not participate in the search itself, it was not error to grant summary judgment as to him.

To summarize, we conclude that the district court erred in holding that there were exigent circumstances as a matter of law to justify the warrantless arrests, that the protective sweep was justified as a matter of law notwithstanding the absence of articulable facts and that

25

there was no basis to hold Lt. Wilson responsible for the subsequent search.

III.

QUALIFIED IMMUNITY

A.

Applicable Principles

A claim under section 1983 for damages against police officers or other government officials will almost inevitably raise issues as to the availability of qualified immunity. Government officials performing discretionary functions are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In addition, and particularly in S 1983 cases involving alleged violations of the Fourth Amendment, the Supreme Court has emphasized that the inquiry is whether a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession. See Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam); Anderson v. Creighton, 483 U.S. 635, 641 (1987). Our cases have

followed that lead. See Kornegay v. Cottingham, 120 F.3d 392, 395-96 (3d Cir. 1997); Parkhurst v. Trapp, 77 F.3d 707, 712 (3d Cir. 1996); Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995).

Thus, law enforcement officials who "reasonably but mistakenly" conclude that their conduct comports with the requirements of the Fourth Amendment are entitled to immunity. Hunter, 502 U.S. at 227. See also Anderson, 483 U.S. at 641; Kornegay, No. 96-7423, slip op. at 5; Orsatti, 71 F.3d at 483. In this way, "the qualified immunity standard `gives ample room for mistaken judgments' by protecting `all but the plainly incompetent or those who knowingly violate the law.' " Hunter, 502 U.S. at 229

26

(quoting Malley v. Briggs, 475 U.S. 335, 343, 341 (1986)); Orsatti, 71 F.3d at 484. It follows that the officer's subjective beliefs about the legality of his or her conduct generally "are irrelevant." Anderson, 483 U.S. at 641. See also Grant v. City of Pittsburgh, 98 F.3d 116, 123-24 (3d Cir. 1996).

The first issue, whether the plaintiff alleges the violation of a clearly established constitutional right, is purely a question of law, and the Supreme Court has made clear that this is a threshold question that should be decided expeditiously to spare a defendant the "unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." Siegert v. Gilley, 500 U.S. 226, 232 (1991).

The language in our cases is much less clear as to whether the second issue, the reasonableness of the official's mistaken belief in the lawfulness of his or her conduct, presents an issue of law for the court or an issue of fact for the jury. We have recently noted the "tension . . . as to the proper role of the judge and jury where qualified immunity is asserted." Sherwood v. Mulvihill, 113 F.3d 396, 401 n.4 (3d Cir. 1997) (citing Grant, 98 F.3d at 122). To some extent that tension may be attributable to our effort to comply with the Supreme Court's instruction that qualified immunity defenses be resolved at the earliest possible point in the litigation while recognizing the difficulty in applying that instruction in situations where there are disputes of relevant fact. See Grant, 98 F.3d at 122.

We are informed by the Supreme Court's discussion of this issue in Hunter, 502 U.S. 224, a case that surprisingly appears not to have been cited in any of this court's

reported opinions. Bryant, who was arrested by Secret
Service agents without a warrant for making threats
against the President, sued them for damages after the
criminal complaint against him was dismissed. The officers
moved for summary judgment on qualified immunity
grounds, alleging, inter alia, that they believed that they
had probable cause to make the arrest based on Bryant's
possession and delivery of a letter indicating that a "Mr.
Image" would assassinate President Reagan on the

27

President's upcoming trip to Germany, on tips that Bryant
had earlier that day talked of assassination generally and
told a co-worker that the President should have been
assassinated in Bonn, and on Bryant's refusal to answer
the agents' questions regarding his intent to harm the
President. Id. at 224-26. The denial of that motion by the
district court was affirmed by the Court of Appeals, which
stated that "[w]hether a reasonable officer could have
believed he had probable cause is a question for the trier of
fact, and summary judgment . . . based on lack of probable
cause is proper only if there is only one reasonable
conclusion a jury could reach." Id. at 228.

The Supreme Court disagreed, stating:

> [t]his statement of law is wrong for two reasons. First,
> it routinely places the question of immunity in the
> hands of the jury. Immunity ordinarily should be
> decided by the court long before trial. Second, the court
> should ask whether the agents acted reasonably under
> settled law in the circumstances, not whether another
> reasonable, or more reasonable, interpretation of the
> events can be constructed five years after the fact.

Id. (emphasis added) (internal citation omitted). The Court
then remanded the case for further proceedings.

A review of our opinions in the last three or four years
discloses that we have not always followed what appears to
be the Supreme Court's instruction that the reasonableness
of an official's belief that his or her conduct is lawful is a
question of law for the court, although other courts have
interpreted the opinion in that way. See, e.g., Pierce v.
Smith, 117 F.3d 866, 871 (5th Cir. 1997) (citing Hunter for
the proposition that "whether under the circumstances a
reasonable officer could believe probable cause for arrest
existed, thus giving rise to qualified immunity, is a question
of law").

Some of our cases have followed this approach, even

without citation to Hunter. In Parkhurst, for example, police officers were sued in a S 1983 action based on the claim that the warrantless search of plaintiff's home violated the Fourth Amendment. 77 F.3d at 710. In reversing the district court's grant of summary judgment on qualified

immunity grounds, we stated that "[t]o determine reasonableness [of the search], a reviewing court must ask `whether a reasonable person could have believed the defendant's actions to be lawful in light of clearly established law and the information he possessed.' " Id. at 712 (quoting Anderson, 483 U.S. at 641). We then applied this standard and held that as a matter of law the search violated the Fourth Amendment, and "the police officers reasonably should have known that their conduct was unlawful." Id. at 713.

We again applied this approach in our recent decision in Rogers v. Powell, 120 F.3d 446 (3d Cir. 1997), where plaintiff filed suit under S 1983 alleging that he had been arrested with neither a warrant nor probable cause. The district court granted the defendant officers summary judgment on qualified immunity grounds. On appeal, we held that no probable cause existed and turned to the issue of qualified immunity, stating that "[w]hether a governmental official is entitled to protection under the doctrine of qualified immunity is a `purely legal question.' " Id. at 454 (citing Acierno v. Cloutier, 40 F.3d 597, 609 (3d Cir. 1994) (en banc)).

The qualified immunity issue in Rogers raised the question whether defendant officers' reliance on the statements of other officers was reasonable. On the issue relevant here, the respective roles of the judge and the jury, we stated that "where a police officer makes an arrest on the basis of oral statements by fellow officers, an officer will be entitled to qualified immunity from liability in a civil rights suit for unlawful arrest provided it was objectively reasonable for him to believe, on the basis of the statements, that probable cause for the arrest existed." Id. at 455 (emphasis added). This court then examined the information possessed by each defendant and determined whether his belief that a warrant or probable cause existed was reasonable. Id. at 455-57. Significantly, we made those reasonableness determinations as a matter of law. Id.See also Capone v. Marinelli, 868 F.2d 102, 104-06 (3d Cir. 1989) (stating that official's objective good faith is purely legal question and holding it reasonable for officer to rely on a facially valid written bulletin indicating that a warrant existed).

We do not suggest that there may never be instances where resort to a jury is appropriate in deciding the qualified immunity issue. For example, in Karnes v. Skurtski, 62 F.3d 485 (3d Cir. 1995), we reversed the district court's grant of judgment as a matter of law on the issue of qualified immunity. Plaintiff had alleged that defendant police officers unlawfully searched his vehicle following an investigatory stop. We held that because there was a genuine issue of material fact as to whether the officers in fact believed that certain "vegetable matter" seen on the floor of the car was or likely could have been marijuana, the issue of the officers' right to qualified immunity was an issue of fact for the jury. We did not reach the issue whether, had there been no factual dispute about the officers' actual belief, the jury rather than the court would have had to decide the question of the reasonableness of their belief. Accord, Lampkin v. City of Nacogdoches, 7 F.3d 430, 435 (5th Cir. 1993) ("It must be recognized that even though [Hunter v.] Bryant diminished the jury's role in qualified immunity cases, it did not entirely abolish it. Rule 56 still has vitality in qualified immunity cases if [there are] underlying historical facts in dispute that are material to the resolution of the questions whether the defendants acted in an objectively reasonable manner in view of the existing law and facts available to them." (internal citations omitted)), cert. denied, 511 U.S. 1019 (1994).

We thus hold, following the Supreme Court's decision in Hunter, that in deciding whether defendant officers are entitled to qualified immunity it is not only the evidence of "clearly established law" that is for the court but also whether the actions of the officers were objectively reasonable. Only if the historical facts material to the latter issue are in dispute, as in Karnes, will there be an issue for the jury. The reasonableness of the officers' beliefs or actions is not a jury question, as the Supreme Court explained in Hunter.

B.

Application of Qualified Immunity

1. The Protective Sweep

As discussed in part II.C.1. above, the protective sweep of Brigden's home was unlawful because the officers at the scene did not possess "articulable facts" justifying a reasonable belief that dangerous individuals remained inside the home after the arrests. To prevail on their qualified immunity claim, -- a claim not reached by the district court -- defendants must show that their conduct did not violate a clearly established constitutional right of which a reasonable officer would have been aware. Because the resolution of that issue is purely a question of law, there is no reason why this court should not address it now.

The Supreme Court has never had the opportunity to apply its holding in Maryland v. Buie, 494 U.S. 325 (1990), to protective sweeps incident to arrests made just outside the home. And prior to today, we have never had occasion to apply the Court's reasoning in that case in a published opinion. Thus, on October 1, 1992, the date of the protective sweep, defendants had no express guidance as to the lawfulness of their conduct from any directly controlling authority. Moreover, at that time, two courts of appeals had upheld protective sweeps incident to arrests made outside the home under the Buie rationale by officers who had little more in the way of articulable facts than did the defendants in this case. See United States v. Oguns, 921 F.2d at 446-47; United States v. Tisdale, 921 F.2d at 1097.

Thus, we conclude that the law as to protective sweeps incident to arrests made outside the home was not clearly established, and even though the protective sweep conducted by the defendant officers exceeded constitutional boundaries, defendants were protected by qualified immunity.

2. Exigent Circumstances

In contrast to the issue of liability for the protective sweep, the defendants' claim that they should be afforded

31

qualified immunity for the arrests, even if there were no exigent circumstances, cannot be disposed of by this court based on the absence of "clearly established law." The law on exigent circumstances was fully developed at the time of the incidents at issue, and a reasonable police officer should have known the applicable law. We note, however, that the Hunter Court framed the inquiry to be asked by the court as to "whether the agents acted reasonably under settled law in the circumstances." 502 U.S. at 228. From our vantage point, we see no "circumstances" that would

affect application of the clearly established law, but are cognizant that this issue was not addressed by the district court. We are unwilling to pretermit argument by the parties that may be relevant to the district court's determination which, as we previously stated, is essentially one of law. Nor is it clear that there are no disputes as to the historical facts. If there are and if they would be material to the determination, then the resolution of those disputes would be for the jury. In sum, we are not in a position to resolve the possibility of qualified immunity at this time and will remand that issue to the district court.

3. The Second Search

It is also clearly established law under the Fourth Amendment that "searches and seizures inside a home without a warrant are presumptively unreasonable." Payton, 445 U.S. at 586. Such warrantless searches are prohibited "absent probable cause and exigent circumstances." Welsh, 466 U.S. at 749. In the case at bar, the district court held that no exigent circumstances justified a warrantless search, and that issue is not before us.

With respect to the existence of clearly established law, the parties have focused on whether defendants complied with New Jersey's law applicable to the issuance of warrants. Although the primary issue is whether the search was unconstitutional under the Fourth Amendment, that question cannot be answered without reference to state law. In Acierno, 40 F.3d at 620, this court looked to state law to determine whether certain rights were "clearly established." And in the Supreme Court's decision in Davis v. Scherer, 468 U.S. 183, 193 n.11 (1984), the Court suggested that

state law may be relevant to the immunity analysis where that law bears directly upon the federal claim, such as where a plaintiff 's property rights are defined by state law for purposes of a due process challenge. Here, similar to claims for the deprivation of property without due process, the validity of the search under federal law depends in part on the validity of the warrant under state law. Thus, the officers' knowledge of the state warrant law bears directly upon the reasonableness, under the Fourth Amendment, of executing the search with an invalid warrant.

Under New Jersey Court Rule 3:5-3 (1992), search warrants may be issued either orally or in writing after complying with various procedural safeguards. Written warrants may be issued when an applicant appears in

person before a judge providing his or her affidavit or testimony and the judge finds that there are grounds for issuing the warrant. The judge shall then "date and issue the warrant identifying the property to be seized, naming or describing the person or place to be searched and specifying the hours when it may be executed." N.J. Ct. R. 3:5-3(a).

A telephonic warrant, on the other hand, may be issued when the applicant is not physically present. The Rule, however, sets forth a variety of heightened procedural safeguards for the issuance of a telephonic warrant so that "the integrity and soundness [of the issuing judge's] determinations can be assured." New Jersey v. Valencia, 93 N.J. 126, 138, 459 A.2d 1149, 1155 (1983). Only a Superior Court Judge, not a Municipal Court Judge like Judge Calloway, is authorized to issue telephonic warrants. The Rule further provides, inter alia, that the Superior Court Judge must "contemporaneously record" the sworn oral testimony of the person(s) providing information to procure the warrant and satisfy him or herself that "exigent circumstances exist sufficient to excuse the failure to obtain a written warrant, and that sufficient grounds for granting the application have been shown." N.J. Ct. R. 3:5-3(b). Once the judge approves the warrant, the judge is required to "memorialize the specific terms of the authorization to search and shall direct the applicant to enter this authorization verbatim on a form, or other

33

appropriate paper, designated the duplicate original search warrant. This warrant shall be deemed a search warrant for the purpose of [this Rule]." Id.

The judge must also "contemporaneously record factual determinations as to exigent circumstances," certify a transcription of the testimony, and "shall promptly issue a written confirmatory search warrant and shall enter thereon the exact time of issuance of the duplicate original warrant." Id. By requiring strict adherence to these exacting requirements, the Rule comports with the New Jersey Supreme Court's insistence on "a reliable underpinning to the judicial decision authorizing a search rendered over the telephone." Valencia, 93 N.J. at 139, 459 A.2d at 1155.

The defendants do not deny that Judge Calloway lacked any authority to issue a telephone warrant because he was not a Superior Court Judge, that the judge did not create a written document of the oral warrant, and that Sgt. Kennedy did not transcribe the judge's oral warrant onto a form "designated the duplicate original search warrant."

Without the creation of such a written record, "the subsequent written warrant cannot be reliably compared to any prior recordation to determine its fidelity to the contents of the original application and oral authorization." Valencia, 93 N.J. at 135, 459 A.2d at 1154.

Thus, with respect to the second search of Brigden's residence, the district court, albeit granting summary judgment for Felsing and Wilson on the ground that they did not participate in the search, denied Larkin's and Kennedy's motion for summary judgment on qualified immunity grounds and directed that that issue be the subject of the jury trial. At the close of the evidence in that trial, presided over by the magistrate judge, plaintiffs filed a motion for judgment as a matter of law on the issue of qualified immunity, which the magistrate judge denied. He charged the jury to decide whether the defendants actually believed that the actions they took were lawful, whether the defendants were motivated by malice or acted in callous disregard or indifference to plaintiffs' rights, and whether their mistake was the sort that a reasonably prudent officer might make. The jury, answering special interrogatories, decided that the warrant was invalid but that Sgt. Larkin,

34

the only defendant as to whom these interrogatories applied, had an objectively reasonable good faith belief that he was authorized to search Brigden's residence and vehicles.

As is evident from our prior discussion of the principles of qualified immunity, the first two questions given to the jury were either erroneous or irrelevant. However, we need not dwell on that error because the third question correctly framed the immunity issue. And although it would ordinarily have been a question of law for the court, in this case there were some historical facts at issue. Specifically, it appears to have been in dispute whether Sgt. Kennedy appeared before Municipal Court Judge Calloway for a telephonic warrant before the second search proceeded, and there was even a factual issue as to whether Judge Calloway issued a telephonic or oral warrant. Thus, this situation is not dissimilar to that in Karnes where we held that a factual dispute relating to qualified immunity must be sent to the jury, and suggested that, at the same time, the jury would decide the issue of objective reasonableness. We see no reversible error in the determination that Sgt. Larkin was entitled to qualified immunity.

The issue of qualified immunity as to Sgt. Kennedy was never resolved by the jury as that issue was foreclosed by

the jury's response to the interrogatories dealing with the role played by each of the remaining defendants in the search, and thereafter with causation and damages. The first interrogatory as to defendant Sgt. Kennedy asked: "Do you find that Officer William Kennedy entered and searched the plaintiffs' residence and/or vehicles on the afternoon of October 1, 1992?" App. at 1194. The jury was told that if it answered "No" to this question, it should not further consider liability against Sgt. Kennedy. Plaintiffs objected to this interrogatory at trial on the ground that it unduly limited the basis on which Sgt. Kennedy could be held liable, and raise their objection again on appeal.

Plaintiffs argue that they presented ample evidence at trial that Sgt. Kennedy played a crucial role in the unlawful search, such as by conveying to the officers at the scene that he had obtained a valid search warrant and by failing to direct that the search be stopped as soon as he realized

that there was no warrant.1 Therefore, they contend that the jury should have been allowed to consider whether Kennedy should be held responsible for his role in the search, regardless of whether he physically entered Brigden's residence.

We have plenary review over the propriety of the challenged interrogatory as it involves a question of the correct legal standard. Mosely v. Wilson, 102 F.3d 85, 94 (3d Cir. 1996). The limitation of the interrogatory to whether Sgt. Kennedy "entered and searched" the residence reflects an erroneous view of the law. Sgt. Kennedy may be held liable for his role in the illegal search if the jury found that he participated by procuring an invalid warrant or authorizing the search based on that warrant. See, e.g., Malley, 475 U.S. at 345 (holding that police officer can be held liable for applying for and relying upon a warrant that no reasonable officer would rely upon, despite the fact that a magistrate judge issued the warrant). Therefore, plaintiffs were entitled to have the jury decide Sgt. Kennedy's liability based on the totality of his conduct.

Similarly, we have held it was error to grant summary judgment for Lt. Wilson as to the second search. It follows that he too will be entitled to a determination on his qualified immunity claim. Moreover, we note from our decision in Rogers that the entitlement to qualified immunity may depend upon circumstances individual to the role played by each defendant, an issue that the district court will have to consider in the first instance.

_____

1. At trial the plaintiffs presented transcripts of the radio transmissions
which occurred during the course of the search, and Sgt. Kennedy read
his own statement made during the search to Sgt. Larkin that "I'm
finishing typing [the warrant] out. I had to retype everything because
nobody knows what the F. they're doing . . . . [Wilson] got the telephonic
search warrant . . . now apparently that wasn't done. So we had to do
the paperwork. I got the affidavit done, the search warrant is in the
typewriter." App. at 846.

36

IV.

CONCLUSION

We affirm the district court's grant of summary judgment
to the defendants on the issues of probable cause to arrest
and the alleged use of excessive force. We reverse the
district court's grant of summary judgment to defendants
Sgt. Felsing and Lt. Wilson on the issue of the warrantless
arrest but affirm the judgment in favor of Sgts. Larkin and
Kennedy.

With respect to the searches, we reverse the district
court's holding that the protective sweep was lawful, but
hold that defendants were entitled to qualified immunity on
that claim. As to the second warrantless search, we affirm
the grant of summary judgment for Sgt. Felsing, but hold
that plaintiffs were entitled to a jury trial as to Lt. Wilson,
in addition to Sgts. Kennedy and Larkin, and that the
interrogatory given to the jury regarding Sgt. Kennedy's role
in the second search was erroneous.

On remand, the jury will have to decide whether Lt.
Wilson and Sgt. Felsing were justified by exigent
circumstances for making a warrantless arrest inside
Brigden's home and, if not, and assuming that relevant
historical facts remain in dispute, whether they are entitled
to qualified immunity. The jury will also have to decide
whether the actions of Lt. Wilson and Sgt. Kennedy
constituted participation in the second search and, if
material historical facts remain in dispute, whether they
are entitled to qualified immunity. Finally, if the jury finds
for plaintiffs on the preceding issues, the jury must then
determine causation and damages.

For the foregoing reasons, we will affirm in part, reverse
in part, and remand for further proceedings consistent with
this opinion.

POLLAK, District Judge, concurring in part and dissenting in part.

Except as to one issue, I find the court's opinion in this difficult case masterly: comprehensive, cogent, correct. The one issue on which I part company with the court is that canvassed in part II.B of the court's opinion. The court there sustains the district court's grant of summary judgment dismissing plaintiffs' claims that the police used excessive force in arresting them. Stating that it is "reluctant to establish a precedent that would subject every police arrest of a group of possible violent offenders to compliance with the Marquis of Queensberry Rules of fair play," the court, while acknowledging that "these police officers came close to the line," concludes that "these circumstances, in totality, do not rise to a Fourth Amendment violation." With great respect, I disagree. I believe that a fact-finder could, on the evidence before the district court, reasonably conclude that the police officers crossed the line. I think it error for this court to hold that arrest methods which the court characterizes as "more akin to . . . Rambo-type behavior . . . than the police conduct expected in a quiet, family seaside town," merit, as a matter of law, a constitutional seal of approval. In my judgment, the district court should have permitted the question whether excessive force was used to go to the jury.

I will not undertake to set forth at length the factual record which underlies my assessment, since the court's opinion fairly states the essential facts. I will, however, set the general scene and highlight certain details which seem particularly relevant to the excessive-force issue. On October 1, 1992, the Sea Isle Police Department deployed all of its on-duty officers, and brought in reinforcements from neighboring towns as well as from its own off-duty roster, to arrest four men who were inside a building and suspected of an assault involving a pistol. At the time of the arrests, various officers stationed outside the building carried, aside from their standard sidearms, .30 caliber rifles, submachine guns, and shotguns. One member of the SWAT team was posted as a sniper. Although no witness recounted the exact number of officers on the scene, a conservative figure can be assembled from the record of

some twenty officers on the scene. This means that at the point of arrest, which was effectuated by SWAT team

members wearing body armor, the police outnumbered the suspects by a ratio of at least five to one. When the four plaintiffs, pursuant to police directive, emerged from the building, they were made to lie down in the dirt and menaced with loaded revolvers by officers who, allegedly, were threatening to "blow your . . . fucking heads off."

I believe that, at the very least, the plaintiffs have raised a genuine issue of material fact concerning whether it was "objectively reasonable," under the standards the Supreme Court articulated in Graham v. Connor, 490 U.S. 386, 396 (1989), for the officers to use the force they did in arresting the plaintiffs. Graham's fact-sensitive inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Id. In light of the record before the court, a jury could reasonably find that the force the officers employed in making this arrest was excessive.

The record, viewed, as it must be, most favorably toward the plaintiffs, indicates that four suspects--the very number the police expected to find--filed out of the building as directed by the officers. The police radio transcript cited in part II.C.1 of the opinion indicates that the officers were apprised, before all the suspects had come out of the building, that the gun allegedly involved was not on the person of any of the arrestees.2 On this account, plaintiffs have certainly raised a triable issue of whether it was objectively reasonable under these circumstances to hold a loaded weapon to the head of a suspect and employ death threats punctuated by obscenity while the apparently

_____

2. The police radio transcript quotes Mr. Devlin as stating "there's only one gun involved, it's a pistol in the brown van in front of the house." The Devlin statement tends to undercut the court's statement in part II.B that the gun "was still unaccounted for." To the extent that the degree of force deployed by the police in making the arrests may be said to have depended on alleged uncertainty as to the whereabouts of the gun, there would appear to be dispute about a material fact.

39

unarmed and cooperative suspects were held to the ground and handcuffed. Considering the formidable array of officers and firepower stationed outside, and given that plaintiffs apparently did not resist arrest, it would be reasonable for a jury to conclude that the force deployed was excessive. Therefore, summary judgment in favor of the

defendants was not appropriate. See Groman v. Township of Manaplan, 47 F.3d 628, 634 (3d Cir. 1995)(reversing grant of summary judgment on excessive-force claim because jury could have found police behavior unreasonable).

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

40